UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

SHAMECA L. BURT,               )
                               )
        Plaintiff,             )
                               )     Civ. No. 1:09-CV-227
        v.                     )     (Collier/Carter)
                               )
MICHAEL J. ASTRUE              )
Commissioner of Social Security )
                               )
        Defendant.             )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382. [1]

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the

disposition of Plaintiff's motion for summary judgment (Doc. 11) and Defendant's motion

for summary judgment (Doc. 15) and the responsive (reply) brief filed by Plaintiff (Doc. 17).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner

be AFFIRMED.

---

[1]Since the relevant DIB and SSI regulations cited herein are virtually identical, citations
will only be made to the DIB regulations, found at 20 C.F.R. §§ 404.1500-404.1599.  The
parallel SSI regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two
digits of the DIB cites (e.g., 20 C.F.R. § 404.1545 corresponds with 20 C.F.R. § 416.945).

## Plaintiff's Age, Education, and Past Work Experience

Plaintiff, born in 1975, was thirty-two years old on the date the ALJ issued his decision (Tr. 28, 102). Plaintiff has past relevant work as a customer service representative and food service worker (Tr. 58). Plaintiff was a younger individual at all times pertinent to the ALJ's decision, with a limited education. She is able to communicate in English (Tr. 27, 55).

## Applications for Benefits

This is an action for judicial review of Defendant's final decision that Plaintiff was not entitled to DIB or SSI under Titles II and XVI of the Social Security Act. Plaintiff alleged disability from March 1, 2004 (Tr. 34, 192-202). On May 23, 2007, after a hearing, ALJ John M. Maclean denied Plaintiff's applications (Tr. 103-20). The Appeals Council vacated that decision and remanded the case for further administrative proceedings (Tr. 121-25). ALJ Maclean gathered additional medical records and held another hearing on March 25, 2008 (Tr. 30-46). The ALJ held the record open for 20 days to update the record (Tr. 32). On July 24, 2008, approximately 4 months after the second administrative hearing, ALJ Maclean again denied Plaintiff's applications (Tr. 19-28). The Appeals Council's July 1, 2009, denial of review left the ALJ's decision as the final decision of the Commissioner (Tr. 1-4). Additional evidence was presented to the Appeals Council (Tr. 726-747). This case is now ripe for judicial review.

## Standard of Review - Findings of the ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden

of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

As the basis of the decision of June 24, 2008 that plaintiff was not disabled, the ALJ

made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since March 1, 2004, the amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.,* 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: dysthymic disorder and borderline personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform any physical exertional work activity; her only limitations involve mental work activities. Because of her severe mental impairments, she is limited to simple, repetitive, unskilled, entry level jobs.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1567 and 416.967).

7. The claimant was born on _____, __, 1975 and was 29 years old, which is defined as a younger individual age 18-49, on the amended alleged onset date (20 CFR 404.1563 and 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

10. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

(Tr. 21-28).

## Issues Presented

Plaintiff raises the following issues:

1. The ALJ's decision is not supported by substantial evidence and violates the principles for disability determinations and decisions.

2 The ALJ failed to give proper weight to the opinions of three examining health professionals.

3. It was reversible error for the ALJ to conclude "It is contrary to common sense that a person who is completely disabled and unable to perform any work activity would be giving birth to so many (9) children at such a young age in such a short period of time."

4. A sentence six remand should be given for the ALJ to consider evidence presented for the first time to the Appeals Council.

## Review of Relevant Evidence

### Plaintiff's Testimony

At the April 2007 hearing, Plaintiff testified she was working part-time as a janitor, but had difficulty getting along with her co-workers (Tr. 53-54). Plaintiff testified she had on occasion left her work area because of nervousness and she had been unable to hold a job due to various conflicts, such as not being allowed to leave her station to use the restroom or coming back late from breaks (Tr. 59-60). At her part-time job, her anxiety about working left her "worn out" by the end of the day and she was unable to work full-time because she could not deal with people (Tr. 61, 66). She was "at peace" when she was by herself or with people who cared about

5

her, such as family members (Tr. 61).  Plaintiff explained she had eight children, and all of them had been taken away because the state concluded the children were at risk of physical and emotional harm if they stayed with her (Tr. 62).

At the March 2008 hearing, Plaintiff explained she lost her janitorial job because of altercations at work (Tr. 36).  Her medications helped her "a little bit," but she did not like to take them because they caused memory loss (Tr. 39).  Also, whenever she was pregnant, she was unable to take her mental health medications (Tr. 41).  She attended counseling, but claimed that, even in that supportive environment, she was unable to get along with others (Tr. 41).

Medical Evidence

On March 18, 2004, Plaintiff saw Evangelito Garingan, M.D. (Tr. 513-22).  Plaintiff reported depression and anxiety manifested by lack of appetite, constant headaches and crying spells, not sleeping well, and having no energy and motivation.  Plaintiff reported these symptoms were due to being physically abused by her ex-husband.  She discontinued taking amitriptyline and two other medications because it made her too sleepy.  Currently she was pregnant, so she was not taking any mental health medication (Tr. 513).  On March 2, 2004 Plaintiff had reported her ex husband broke her leg which required surgery in 1993 (Tr. 516, 517). Dr. Garingan noted that Plaintiff was rude and guarded when the interview began, but calmed as the interview progressed.  Dr. Garingan assessed mood disorder, physical abuse of Plaintiff's children, and personality disorder.  Dr. Garingan assessed a Global Assessment of Functioning (GAF) of 50 (Tr. 518).   Dr. Garingan prescribed Zoloft, which, at her next appointment in April 2004, Plaintiff reported made her sleepy (Tr. 511).

In May 2004, Plaintiff began counseling with Nancy Rose, a social worker (Tr. 557-60). Plaintiff was friendly, her motor behavior was normal, her speech was normal, her mood was hopeful, and her affect was appropriate. Her memory was intact, but her judgment and insight were both poor (Tr. 558). Her flow of thought was normal, logical, relevant, and coherent (Tr. 559). Plaintiff reported feeling depressed over the loss of all six of her children, her house, her car, and her husband and becoming homeless (Tr. 557). Ms. Rose commented Plaintiff was a "very out-going and social person" (Tr. 560). They set up a therapy plan (Tr. 555-56). In June 2004, Plaintiff reported a disagreement with her supervisor that lead to a meeting and also reported that the State Attorney was "calling people," and "trying to get her thrown out of her apartment and fired from her job." They discussed ways to handle disputes at work in a professional manner (Tr. 553). In July 2004, Plaintiff complained about an individual who was spreading gossip and "running her down and causing her to be fired" (Tr. 552). In August 2004, Plaintiff reported her court session concerning her children did not go well, stating the children's guardian ad litem was "angry with her" and recommended she not be allowed to see her children (Tr. 551). In that session and in a later session that month, the social worker tried to help Plaintiff consider how she could comply with the court's requirements (Tr. 550-51).

In September 2004, Plaintiff reported she lost her job because she could not stand on her feet all day long (Tr. 549). Again, at that session and the later September session, the social worker tried to help Plaintiff consider how to comply with the court's requirements (Tr. 548-49). In November 2004, Ms. Rose noted Plaintiff spent most of the session complaining about the judge, her attorney, the caseworkers on her child custody case, and the father of her children (Tr.

547).  Ms. Rose explained it was counter-productive to make "everyone her enemy" (Tr. 547).

Ms. Rose assessed a GAF of 60 (Tr. 544).  In December 2004, Plaintiff denied she had ever

abused her children (Tr. 543).  In January 2005, Plaintiff was upset because her lawyer attempted

to get her to sign parental termination papers.  Ms. Rose pointed out to Plaintiff she had a high

rate of "no shows and cancellations" (Tr. 542).  In February 2005, Plaintiff continued to blame

others for her problems.  Ms. Rose tried to get her to take steps to change her behavior (Tr. 540).

In February 2005, the social worker at Fortwood Center listed a diagnosis of major

depression moderate, panic disorder and agoraphobia and recommended individual therapy and

medication (Tr. 365).  Plaintiff attended a medical treatment interview in March 2005 and was

prescribed medication (Tr. 361-62).   In December 2005, Plaintiff reported she was still

depressed and her medications were renewed.  The social worker commented she had not been in

since March 2005 (Tr. 360).  In January 2006, Brooke Kocher, one of Plaintiff's social workers,

completed a form concerning Plaintiff's ability to function (Tr. 530-32).  The social worker

assessed moderate difficulties in activities of daily living, interpersonal relationships,

concentration, persistence, and pace, and in her ability to adapt (Tr. 530-31).  The social worker

assigned a GAF of 51 (Tr. 532). In February 2006, the social work team at Fortwood set out a

treatment plan for Plaintiff's therapy (Tr. 528-29).  Dr. Geddam saw Plaintiff for medication

check-ups in February, April, and May 2006 (Tr. 525-27).

In February 2006, Plaintiff saw Carol Phillips, Ed.D., at the request of the state agency

(Tr. 314-18).  Plaintiff explained that, while she was taking a nap and her mother was watching

the children, her three-year old got "into the sink somehow," and "turned the hot water on and

burned himself."  When she sought treatment for him at the hospital, the hospital called the state

child services agency, who removed all of her children to foster care.  Plaintiff complained that

she lost all seven children "over nothing" (Tr. 315).  Dr. Phillips noted that Plaintiff had "no

insight" into the problems concerning custody of her children (Tr. 317).  As for her ability to

work, Dr. Phillips opined that Plaintiff had no impairment in her ability to understand and recall

short, simple work functions, and she had mild-to-moderate impairments in her ability to

concentrate, persist at work tasks, and socially interact with others (Tr. 317).

In March 2006, Frank D. Kupstas, Ph.D., reviewed Plaintiff's records (Tr. 319-36).  He

opined Plaintiff could sustain concentration, persistence, and pace over extended periods for

simple and detailed tasks with some difficulty at times, "but still can do so."  She was able to

interact with the general public, notwithstanding some difficulty at times (Tr. 335).

In June 2006, Plaintiff attended two therapy sessions at Fortwood (Tr. 477).  The state

had recently taken away her newest baby, her 8th.  Plaintiff expressed increased irritability from

the court hearings.  The social worker discussed with Plaintiff the role of Plaintiff's unrealistic

expectations in creating disappointment and anger with the court system (Tr. 477).  In December

2006, Ms. Kocher reported that Plaintiff had actively participated in individual therapy and had

made moderate progress toward her therapy treatment goals.  Plaintiff's focus varied from

relationships with family members and peers, to self-esteem issues, to managing stress from her

legal issues.  Overall she had shown moderate progress with mood stabilization but low progress

with impulse control, maintaining concentration and following through on plans/goals she had

set for herself.  She had made progress with using her research and writing skills to express and

process emotional issues (Tr. 503).

In February 2007, the social worker at Fortwood noted that Plaintiff needed to improve her compliance with therapy and doctor appointments (Tr. 470). In March 2007, Padmavathi Geddam, M.D., reported that he prescribed Abilify, Lithium, Remeron, and Lunesta to Plaintiff (Tr. 502).

In May 2007, Ms. Kocher set up a therapy plan for Plaintiff (Tr. 615-16). Also in May 2007, Ms. Kocher noted Plaintiff had an upcoming court date because she had been charged with theft for stealing a check, which was a violation of her probation. Plaintiff was employed part-time with a cleaning service (Tr. 614). In June 2007, Plaintiff started counseling with AIM Center (Tr. 640-54). In a September 2007 service summary report, Plaintiff reported she was looking for a job and had two job interviews during September and had been attending GED classes but missed several due to poor health. She planned to return to them (Tr. 636). Elizabeth Hazelwood, Plaintiff's social worker, noted Plaintiff intended to return to her GED classes after she had her baby (Tr. 631). Plaintiff had been "working hard" to establish a support group for parents who had lost custody or who were facing termination rights (Tr. 631).

In January 2008, Plaintiff returned to Dr. Geddam for the first time since March 2007. Plaintiff reported the birth of her 9th child and of her decision to go to Savannah to have the child escape from DCS, however the child was taken by DCS from the hospital. She also reported she was going to continue to have children because it made her happy to be pregnant because the

"baby was with me[2]".  Plaintiff blamed the state social services for her problems and joined a support group for parents in custody disputes.  Dr. Geddam changed Plaintiff's medications (Tr. 609).

In January 2008, Jerome A. Sherard, M.D., who treated Plaintiff for physical complaints, explained in a letter to Plaintiff's attorney that Plaintiff had recently been attacked during a robbery in her home (Tr. 523, duplicated at Tr. 673-74).  Although that individual was in prison for ten years, Dr. Sherard noted there was always a possibility that, if Plaintiff worked with the public, this individual could contact her (Tr. 523).  He diagnosed post-traumatic stress disorder, noting Plaintiff's stress was exacerbated by the fact that the child she was carrying during the violent attack was removed by the state as soon as she delivered the baby (Tr. 524).  He opined Plaintiff was emotionally, psychologically and mentally disabled from employment and working would be harmful to her (Tr. 524).  That same month, Dr. Sherard wrote to the state, explaining it was "clear and imperative" that Plaintiff needed to continue on TennCare due to her gallbadder disease (Tr. 663).  In February 2008, Dr. Sherard reported to the Chattanooga Housing Authority that Plaintiff should be considered disabled due to her "emotional" impairment (Tr. 659).

In February 2008, Dawn Hampton, a social worker, reported Plaintiff had moderate difficulties with her activities of daily living, concentration, persistence, and pace, and in her ability to adapt (Tr. 611-12).  She had marked difficulties with her interpersonal relationships, in that she used social services programs extensively and had limited capacity to communicate

---

[2] Other comments made by Plaintiff indicate that Plaintiff was happiest when pregnant because the state agency could not remove her child until after delivery.  The agency removed her latest child as soon as she delivered the baby (Tr.477, 524).

effectively with her family (Tr. 611).  In March 2008, Plaintiff returned to Dr. Geddam and continued to talk about the support group for women having problems with the state.  She was alert and oriented and denied having flashbacks concerning her recent assault.  Her insight and judgment were limited and she was "positive" for mild paranoia.  He assessed major depressive disorder with phychotic features and borderline personality disorder and continued her medication (Tr. 608).

Termination of Parental Rights

In June and August 2005, Plaintiff saw Roy F. Smith, Ph.D., for a Parenting Evaluation in connection with the termination of parental rights (Tr. 94-98).  Dr. Smith explained that Plaintiff's three-year old child had suffered serious burns inconsistent with Plaintiff's claim that the child had been accidently burned in a tub of hot water.  After investigation, Child Protective Services removed all of Plaintiff's children and her two most recent births which were after the burning incident (Tr. 94). Dr. Smith explained he was not able to complete a full evaluation because Plaintiff failed to attend a number of scheduled appointments.  His report was not a completed Psychological Evaluation due to her non-compliance   Plaintiff was a "verbally expressive" woman and held firm to her belief that the child's injuries were not due to abuse. There were no overt indications of clinical depression.  Her speech was logical and coherent, with no indication of psychotic thinking, such as hallucinations, delusions, or other features (Tr. 95).  Plaintiff "appeared motivated to portray herself as being exceptionally free of common shortcomings to which most individuals readily admit."  She was reluctant to admit even minor faults or to see these in herself (Tr. 95).  Plaintiff saw little need to change her behavior or

patterns (Tr. 96). Dr. Smith noted Plaintiff did not deal effectively with her problems because she had "a high level of denial and minimization of problems." He opined her strong need for acceptance combined with her difficulty in knowing and asserting her rights, suggested it was unlikely that she could be protective of her children when needed, especially if doing so threatened the relationship with the male she needed. He also noted a depressed mood, combined with mild anxiety and worry. He concluded there was a high likelihood that Plaintiff would be unable to protect her children and she did not recognize her culpability concerning the three-year-old's burns. She had not yet confronted her own domestic abuse issues and probably did not fully recognize its impact on her children (Tr. 97).

In February 2006, the Hamilton County, Tennessee Juvenile Court terminated Plaintiff's parental rights as to five of her children (Tr. 166-76). In the Order, the court noted that the child that had been burned was "denied medical attention for at least two days" (Tr. 168). In order to keep her children, Plaintiff was required to

1) undergo a parenting assessment and follow the recommendations of the assessment;
2) complete parenting classes;
3) complete a psychological examination and actively participate in any counseling recommended until all treatment goals were met;
4) complete counseling designed to deal with domestic abuse issues;
5) provide an adjudication of abuse, admit to abusing her children;
6) her health permitting, maintain appropriate employment;
7) pay child support; and
8) complete a drug and alcohol assessment

(Tr. 170-71).

The court found that Plaintiff made "no substantial progress" towards meeting any of these goals (Tr. 171). The court found the conditions which led to the removal of her children

13

continued to persist and the conditions existed which "in all probability" would cause the children to be subject to further abuse and neglect (Tr. 174). Several pages appear to be missing, but the later court petition explained that Plaintiff's parental rights were terminated (Tr. 156).

In April 2007, the Tennessee Department of Children's Services petitioned the county court to terminate Plaintiff's parental rights as to three of Plaintiff's children[3] (Tr. 151-64). The petition noted that Plaintiff abandoned her children by willfully failing to visit or making only token visitation with the children for four months, despite knowing that the children were in state custody and knowing that she was free to visit the children (Tr. 153). In addition, Plaintiff did not support these children, or make any effort to support them (Tr. 154). Plaintiff made no reasonable effort to provide a suitable home and demonstrated a lack of concern for the children to such a degree that children's services argued that it appeared unlikely that Plaintiff could provide a suitable home for the children (Tr. 156). The petition also noted that, after the court found that Plaintiff had abused one of her children, Plaintiff's parental rights to her five older children were involuntarily terminated (Tr. 156, referring to Tr. 166-74). Due to abuse, Plaintiff was criminally charged with Aggravated Child Abuse, which was reduced to Attempted Aggravated Child Neglect, due to Plaintiff's stated completion of anger management and parenting classes (Tr. 156). This adjusted conviction was a Class B Felony with a ten-year sentence, and the special conditions of intensive probation and no contact with the victim (Tr. 156-57). Children's Services attempted to provide services to Plaintiff, but she failed to keep in

---

[3] Although the petition included the children's father, he is not a subject of this case and there is no reason to divulge any further information about him.

contact with the Department or failed to cooperate (Tr. 157). Further, Plaintiff subjected another child to severe abuse. The petition states Dr. Bertin Glennon administered a parenting assessment[4] but he noted many of the instruments used were invalid due to the mother's responses. Dr. Glennon was able to make observations and recommendations. He diagnosed Plaintiff with Antisocial Personality Disorder and observed there was "much aggressiveness and violence" in her environment (Tr. 158). Ms. Rose, Plaintiff's social worker, noted Plaintiff did not agree with Dr. Glennon's diagnosis, denied having a problem with anger or violence, and she was not amenable to treatment for these issues. She also refused treatment for a personality disorder (Tr. 158-59). The petition asked the court to terminate Plaintiff's parental rights (Tr. 162-63).

Analysis

In her first three issues Plaintiff asserts the ALJ's decision is not supported by substantial evidence because the ALJ failed to give proper weight to the three examining mental health professionals and erred in his comment that Plaintiff's giving birth to 9 children was inconsistent with complete disability and inability to perform work activity. If the birth of 9 children were the only basis for the ALJ's decision, I would agree, however, I conclude there was other evidence in the record on which the ALJ based his decision. I therefore conclude there was substantial evidence to support the decision.

Plaintiff's claim is based on a serious mental impairment. Plaintiff argues it was the sole cause of the loss of her children and relies heavily on the proceedings in Juvenile Court to

_____

[4] This assessment is not in the record, but there is no reason to dispute the state's account.

support her claim of disability here. However, as the Commissioner argues, Plaintiff lost her children due to child abuse and her unwillingness to admit her problems, but also because she showed little interest in her children after they were removed. She failed to even try to see her children, suggesting that she was not as anxious to comply with the state's orders as she now contends. As the ALJ explained, there is "scant" evidence that demonstrated a disabling mental impairment, although some restrictions were necessary (Tr. 25). The ALJ recognized Plaintiff's mental problems, but the ALJ accommodated those problems with an RFC that limited Plaintiff to simple, repetitive, unskilled, entry-level jobs (Tr. 23). As in most social security cases, there is evidence of record which contradicts the Commissioner's findings. However, if substantial evidence also exists to support the Commissioner's findings, then those findings must be affirmed. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). In other words, if supported by substantial evidence, the Commissioner's determination must stand regardless of whether a reasonable mind might resolve the disputed issues differently. *See Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990).

There is substantial evidence to support the ALJ's decision. Although it was clear that Plaintiff needed some work-related mental restrictions, the ALJ concluded she was able to do more than she alleged (Tr. 23-24). She got along with her supervisor, attended church, rode the bus, did household chores, and went grocery shopping (Tr. 23, referring to 54, 56, 646-47, 652). Plaintiff described her strengths as having good communication skills, being a good listener, enjoying helping others and enjoying her work (Tr. 25, referring to Tr. 647). The ALJ questioned Plaintiff's motivation, noting, among other things, that Plaintiff was not cooperative (Tr. 25).

For example, in January 2005, Ms. Rose pointed out to Plaintiff that she had a high rate of "no shows and cancellations" (Tr. 542). In February 2007, the social worker at Fortwood noted Plaintiff needed to improve her compliance with therapy and doctor appointments (Tr. 470).

Plaintiff argues the fact Plaintiff sought psychological treatment, that she was diagnosed with Major Depressive Disorder, severe, with psychotic features and Borderline Personality Disorder, and that her GAF scores ranged from 45 to 60, are indicative of a serious impairment in her ability to function (Plaintiff's Brief at 4, referring to Tr. 470, 502, 511, 525, 534, 607, 726). The Commissioner notes the ALJ did not suggest Plaintiff did not need counseling or medication and points to the fact she received both. However, in February 2007, Plaintiff's counselor also noted she was non-compliant with her therapy and medical appointments (Tr. 470). Although it is true that Plaintiff carried various mental health diagnoses, she had only mild-to-moderate depression at a time when she had "just started" taking antidepressant medications in April of 2004 (Tr. 511). Even then, her mental status examination was "normal." Her Affect was normal; thought process and speech, logical; thought content, perception and memory/orientation, normal (Tr. 511). In May 2006, Dr. Geddam noted that Plaintiff was "extremely emotional" concerning the possibility that the state may take away her baby who was due in June (Tr. 525). At that visit, Dr. Geddam noted that Plaintiff's memory and concentration were both poor, but her depression was a level two-to-three, defined by that form as between poorly stabilized and stabilized with outpatient treatment (Tr. 525). In June the state took away her baby immediately after birth (Tr. 534). Ms. Rose, Plaintiff's counselor, encouraged Plaintiff to cooperate with the state in order to regain custody of her children (Tr. 534). These treatment

17

notes suggest nothing more than what the ALJ said: Plaintiff had mental health issues and she was undergoing treatment (Tr. 23-24).

Plaintiff relies on her GAF scores as evidence of her inability to perform work. The GAF Scale reports a clinician's judgment of an individual's overall level of functioning and is used in planning, measuring the impact, and predicting the outcome of treatment. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000) (DSM-IV-TR). However, as the Agency explicitly stated in comments to final rules: "The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listing." 65 Fed. Reg. 50746, 50764-65 (2000). Therefore, the GAF score alone is not a grounds to establish severity, any more than a diagnosis, standing alone, establishes severity. *See Young v. Sec'y of Health & Human Servs.*, 964 F.2d 146, 151 (6th Cir. 1990) (mere diagnosis of an impairment does not indicate the severity of the condition nor the limitations, if any, that it imposes). What is important is the impact of Plaintiff's condition on her ability to work.

Plaintiff argues the ALJ erred in the weight given medical sources concerning her ability to work (Plaintiff's Brief at 4-6). She points to mental health professionals considered by Juvenile Court Judge Suzanne Bailey in her Termination of Parental Rights Decree of February 27, 2006 (Plaintiff's Brief, referring to Tr. 150-75). She argues Dr. Glennon opined the treatment of Plaintiff's antisocial personality disorder would take "years" of treatment with an extremely low likelihood of success (Plaintiff's Brief at 4, referring to Tr. 171), that the court recognized that Plaintiff's disorder was not amenable to treatment (Plaintiff's Brief at 5, citing to Tr. 171-72). She also points to the juvenile court's finding that Plaintiff had failed to satisfy the

18

prerequisites set out by the court and that she was "incapable" of conforming her behavior and social interaction skills (Plaintiff's Brief at 5, referring to Tr. 174).

As the Commissioner argues, it is not necessary that an individual be "cured" or completely symptom-free in order to work, as long as the ALJ reasonably accommodated her impairments with appropriate restrictions. Here, the ALJ restricted Plaintiff's RFC because "of her severe mental impairments," to simple, repetitive, unskilled, entry-level work (Tr. 23). The fact that Plaintiff's condition is long-lasting and difficult to cure is not necessarily a barrier to all work.

Furthermore, the Juvenile Court also noted Plaintiff testified she did not want to be employed because she was trying to obtain disability benefits (Tr. 174). The judge noted Plaintiff had "provided no proof she has any medical condition that would prevent her from working," and, in fact, testified if her children were returned to her, she would "get a job right away" (Tr. 174). The judge also noted Plaintiff had provided "no evidence whatsoever" that she was unable to work or was unable to pay child support (Tr. 174). The judge concluded it was not likely the children would be returned because Plaintiff had not changed her behavior of abuse to her children (Tr. 174). In any event, the Juvenile Court Judge was determining questions of child custody and was not making a determination of the ability to perform work pursuant to social security regulations.

Plaintiff argues that the ALJ failed to give any weight to the opinions of Drs. Smith, Robertson, or Glennon, but then concedes the ALJ "did not have the benefit of [their] complete reports . . . that were submitted for admission to the record with the Request for Review"

(Plaintiff's Brief at 5). The reports that were not part of the record before the ALJ and must be disregarded by this Court because a court may not consider such evidence in its substantial evidence review of the ALJ's decision. It was not before him. It will, however, be considered in light of a sentence six remand.

As to the report by Dr. Smith in the record, although the ALJ did not discuss Dr. Smith's report, he was aware of the Hamilton County court ruling and related documents (Tr. 23-24). The ruling discussed Dr. Smith's evaluation briefly (Tr. 174). In any event, as the Commissioner argues, Dr. Smith's report does not support Plaintiff's position. Dr. Smith noted Plaintiff's speech was logical and coherent, with no indication of psychotic thinking, such as hallucinations, delusions, or other features (Tr. 95). Plaintiff "appeared motivated to portray herself as being exceptionally free of common shortcomings to which most individuals readily admit" (Tr. 95). Dr. Smith noted Plaintiff did not deal effectively with her problems because she had "a high level of denial and minimization of problems" (Tr. 97).

Plaintiff argues the ALJ erred in placing emphasis on Plaintiff's own self-reports of her strengths and abilities and, thus, erred in rejecting the opinion of Dr. Phillips, who opined that Plaintiff had mild-to-moderate impairments in concentration, persistence, and ability to interact socially with others (Plaintiff's Brief at 5, referring to Tr. 26, 317). The ALJ specifically noted that he gave "persuasive weight" to the opinion of Dr. Phillips (Tr. 26). The ALJ, however, specifically rejected that part of Dr. Phillips' opinion that Plaintiff had mild-to-moderate impairments in her ability to maintain socially appropriate behavior, interact appropriately with others, and adapt to change (Tr. 26, referring to Tr. 317). The ALJ accommodated all of

Plaintiff's restrictions which he found credible with simple, repetitive, unskilled, entry level jobs at all exertional levels. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(I) ("the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people))" In particular, the ALJ noted the record did not reflect Plaintiff's inability to perform her janitor job (which she had already performed on a part-time basis) on a full-time basis (Tr. 27).

Dr. Kupstas reviewed Plaintiff's records, including Dr. Phillips' evaluation, and opined Plaintiff could sustain concentration, persistence, and pace over extended periods for simple tasks (Tr. 335). She was able to interact with the general public, notwithstanding some difficulty at times (Tr. 335).

Plaintiff argues her lack of insight into her own abilities and mental condition was "quite likely in the face of a personality disorder." (Plaintiff's Brief at 6). However, Plaintiff again refers to Dr. Glennon's report from Appeals Council evidence, evidence that is not properly part of the substantial evidence review. (Plaintiff's Brief at 6, referring to Tr. 740, 742).

I do not conclude the ALJ's reliance on Plaintiff's own words and testimony is error. The ALJ noted at her first hearing Plaintiff admitted she got along with her supervisor, attended church, rode the bus, and went grocery shopping, all activities that involved other people (Tr. 23, 54-56). In May 2004, Ms. Rose commented that Plaintiff was a "very out-going and social person" (Tr. 560). In September 2004, Plaintiff told Ms. Rose she lost her job because she could not stand on her feet all day, and did not aver that she lost her job due to difficulties getting along with others (Tr. 549). In September 2007, Plaintiff reported to Ms. Kocher that she was looking

for a job and had two job interviews during September (Tr. 636). Also, Plaintiff had been "working hard" to establish a support group for parents who had lost custody or who were facing termination of their parental rights (Tr. 631). In January 2008, Plaintiff told Dr. Geddam she had joined a support group for parents in custody disputes (Tr. 609). All these activities suggest that Plaintiff was able to deal with the public.

Plaintiff argues the ALJ erred in rejecting the statements of Dr. Sherard, who stated that working would be harmful to Plaintiff (Plaintiff's Brief at 6, referring to Tr. 674). The ALJ addressed Dr. Sherard's statements and explained why he rejected those statements (Tr. 26). First, the ALJ was not convinced that Dr. Sherard actually treated Plaintiff because Dr. Sherard was a pediatrician and Plaintiff did not provide any treatment records to support his conclusions (Tr. 26). To the extent that Dr. Sherard treated Plaintiff, it was for her physical conditions, such as her gallbladder disease (Tr. 663). Dr. Sherard's opinion was given in light of the following events. In January 2008, Plaintiff reported that she had recently been attacked during a robbery in her home and the individual who attacked her was serving ten years in prison (Tr. 523). Plaintiff was concerned he would somehow get out, find her, and harm her (Tr. 523). At the time of the attack, Plaintiff was pregnant and, when she delivered the child, the child was removed by the state (Tr. 524). As a result, Dr. Sherard felt Plaintiff was emotionally, psychologically, and mentally disabled and working would be harmful (Tr. 524). The ALJ is not bound by that opinion. The ultimate determination of whether a claimant is "disabled" within the meaning of the Act rests with the Commissioner, not with Dr. Sherard, even if he were to be considered a treating physician. *See* 20 C.F.R. §§ 404.1527(e)(1); 416.927(e); *see also* SSR 96-5p, 61 Fed.

Reg. 34471, 34474 (July 2, 1996) (a treating physician's conclusory opinion that an individual is "disabled" is never entitled to controlling weight or special significance).

Plaintiff argues the ALJ failed to address the testimony of the vocational expert, who testified that, if Plaintiff was as disabled as the attorney's hypothetical question assumed, she would be unable to work (Plaintiff's Brief at 6-7). The purpose of hypothetical questions is to find out if jobs are available in response to a question that matches the vocational characteristics of Plaintiff, including her RFC. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact."). The ALJ is not required to explain why he did not adopt a vocational expert's answer to a hypothetical question that did not include the restrictions found by the ALJ in his RFC. The RFC, as set out by the attorney's question, included serious limitations in her ability to get along with others, a history of losing jobs due to altercations, not capable of maintaining attention for two hours, and not punctual (Tr. 36). The ALJ did not accept these restrictions listed in the attorney's hypothetical question and there was no error in the ALJ's failure to discuss it.

Finally, as alluded to above, in resolving the issue of whether the ALJ's final determination is supported by substantial evidence, the decision cannot turn upon whether Plaintiff or the reviewing Court agrees with the ALJ's findings. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts.").

Based on the record as a whole, I conclude there is substantial evidence to support the decision of the ALJ.

Sentence Six Remand

With her request for review, Plaintiff submitted a brief and additional records (Tr. 295-313, 729-747).  Although Plaintiff relies on these records in her argument, the Commissioner argues she has not requested a sentence six remand and these parts of Plaintiff's arguments should be disregarded by the Court.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("[T]his court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.").  However, because the Commissioner mentioned the standard of sentence six remand in his brief and Plaintiff clearly raises it in her Reply, I will consider that evidence only as it relates to the issue of a sentence six remand.

On judicial review, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . ." 42 U.S.C. § 405(g).

Because none of the evidence submitted to the Appeals Counsel was before the ALJ, the Court cannot reverse based on this evidence.  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Casey*, 987 F.2d at 1233.  This evidence may be considered only for the purpose of determining whether remand is appropriate under sentence six of 42 U.S.C. § 405(g).  *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).  In order to obtain a sentence six remand, Plaintiff

24

must demonstrate that the evidence is new, that it is material, and there exists good cause for the failure to have incorporated this evidence in the prior record. 42 U.S.C. § 405(g), *Cotton*, 2 F.3d at 695. Additional evidence is considered "new" if that evidence was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). To meet the good cause requirement, Plaintiff must give a valid reason for failing to obtain the evidence prior to the ALJ decision. *Cotton*, 2 F.3d at 695; *Cline*, 96 F.3d at 149. It is not enough to argue that the assessment was not performed sooner. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) ("While the dates of the reports alone seemingly satisfied the good cause test . . . this circuit has taken a harder line . . . the complainant must give a valid reason for his failure to obtain evidence prior to the hearing.").

In this case the material presented was clearly not new in the sense it did not exist at the time of the hearing. These records were long in existence and were introduced in Juvenile Court Proceedings. Further, the existence of these records was known to Plaintiff. It appears Plaintiff's counsel was not aware of their existence likely because of her client's decision not to provide them. In her Reply, counsel notes Plaintiff was reluctant in providing these documents and considered them to not have any impact on her Social Security case (Plaintiff's Response Brief, Doc. 17, p 3). Under these circumstances, I conclude the records in question are not new and good cause has not been shown as to why they were not made a part of the administrative record prior to the hearing. The records would also have to be material. Additional evidence is material only if there is a reasonable probability that the ALJ would have reached a different disposition of the disability claim if presented with the evidence. All of the records appear to be

directed toward the issue of whether Plaintiff can care for her children, not whether she is able to perform any form of gainful employment. They do support her claim of mental health problems, however, the ALJ addressed her mental limitations and concluded she could do some work in spite of them. Therefore, I do not find the evidence is new or material or that good cause has been shown why it was not presented to the ALJ.

Conclusion

Having carefully reviewed the entire administrative record and the briefs of the parties filed in support of their respective motions, I conclude there is substantial evidence in the record to support the findings of the ALJ and the decision of the Commissioner, and neither reversal nor remand is warranted on these facts. Accordingly, I RECOMMEND:

(1) The plaintiff's motion for summary judgment (Doc. 11) be DENIED.

(2) The defendant's motion for summary judgment (Doc. 15) be GRANTED.

(3) The case be DISMISSED. [5]

Dated: July 6, 2010        *s/William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[5]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).